## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| ERICH GOELDNER, | ) |
|     Plaintiff, | ) |
| vs. | ) Cause No. _____ |
| UNION PACIFIC RAILROAD COMPANY, | ) |
|     Defendant. | ) **AMERICANS WITH DISABILITIES ACT** |
| **Serve Registered Agent at:**<br>**THE CORPORATION COMPANY**<br>**120 SOUTH CENTRAL AVENUE**<br>**CLAYTON, MO 63105** | ) **TRIAL BY JURY DEMANDED** |

## COMPLAINT

COMES NOW Plaintiff Erich Goeldner, by and through counsel, Schlichter, Bogard & Denton, LLP and for his Complaint, states as follows:

### PARTIES, JURISDICTION, AND VENUE

1. This action arises under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*

2. At the time of the incidents alleged herein, Plaintiff Erich Goeldner ("Goeldner") was employed by Defendant Union Pacific Railroad Company ("UP") as a brakeman/conductor, having been hired in January 2006.[1] At all times relevant, Goeldner was an employee of UP within the meaning of the ADA, and UP was Goeldner's employer within the meaning of that law.

3. At the time of the incidents alleged herein, Goeldner was a resident of Kansas City, Missouri and was employed by UP in Kansas City, Missouri. Goeldner worked out of UP's Kansas

---

[1] Goeldner held the position of engineer but, due to lack of seniority, typically worked as a brakeman/conductor.

1

City service unit from which he was regularly assigned to conduct freight trains from Kansas City to various other locations, including cities in Iowa and Missouri.

4. At all times relevant, UP has been a corporation duly organized and existing under the laws of Missouri, and is engaged in interstate commerce and is in the business of hauling freight by rail in various states, including in Kansas City, Missouri.

5. At all times relevant, UP has employed more than 500 employees.

6. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331.

7. Venue of this action properly lies in the United States District Court for the Western District of Missouri pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims occurred within this district and division in that the UP discriminated against Goeldner, a UP employee based in Kansas City, Missouri.

## FACTUAL ALLEGATIONS

### UP's Fitness for Duty Requirements

8. UP's Medical Rules, as reviewed and revised on February 1, 2014, apply to all UP employees across the country. They outline the Fitness for Duty program at UP. A true and accurate copy of UP's Medical Rules is attached hereto as **Exhibit 1**.

9. The Medical Rules require, among other things, that all employees in Operating Department field positions (including Transportation positions) disclose "any new diagnosis, recent events, or change" in various conditions that UP labels "Reportable Health Events." *Id.*

10. Under the Medical Rules, Fitness for Duty evaluations are also automatic for any employee who transfers "from an existing Union Pacific job assignment to a different job assignment outside the provisions of the collective bargaining agreement" to other identified positions. *Id.*

11. UP's Fitness for Duty program is even broader in practice. UP routinely triggers the Fitness for Duty process for employees who have never indicated that they are unable to perform the essential functions of their job simply because UP learns that the employee has, or has had in the past, certain health conditions.

12. UP's Fitness for Duty evaluations are not individualized assessments of an employee's ability to safely perform the essential functions of his or her job.

13. UP does not physically examine the employee and routinely disregards the opinions of the employee's treating doctor who has physically examined the employee.

14. Rather, UP's Health and Medical Services department makes broad requests for medical records from the employee.

15. Once UP reviews these records, UP's Chief Medical Officer, Dr. John Holland, along with his team, conducts a "file review" and issues a Fitness for Duty determination that the employee is either fit for duty, fit for duty with restrictions, or unfit for duty.

16. Dr. Holland is a paid employee of UP and currently serves as UP's Chief Medical Officer. He has not practiced clinical medicine since approximately 2007.

17. Dr. Holland and his team routinely issue Fitness for Duty determinations that disqualify employees from their positions on the basis of their disabilities, even though the disabilities do not affect the employees' ability to perform the essential functions of their job.

18. Among other things, Dr. Holland and his team may issue a determination that the employee is fit for duty but has medical restrictions that are neither accommodated by UP nor medically necessary.

19. The Fitness for Duty determinations are driven by generalizations about health conditions and treatments, not by individualized assessments of an employee's performance of the

3

Case 4:19-cv-00692-NKL   Document 1   Filed 08/30/19   Page 3 of 12

essential functions of his/her job as required by the ADA.

20. Dr. Holland has standard protocols for employees with certain health conditions or treatments.

21. For example, Dr. Holland labels employees with a broad range of health conditions as "sudden incapacitation" risks and then issues stock restrictions that prohibit them from performing a variety of tasks.

22. Dr. Holland automatically imposes these sudden incapacitation restrictions, and has authorized Health and Medical Services employees to do to the same, when certain health conditions show up in an employee's medical history.

23. As a result of the aforementioned conduct, UP employees—including but not limited to Goeldner—who have never had a problem performing the essential functions of their jobs have been forced to disclose sensitive medical information, stay out of work without pay, and/or lose their livelihoods.

**Plaintiff's Fitness for Duty**

24. In or around 1983, Goeldner suffered a dislocated left shoulder as a result of an off-duty incident.

25. Following this initial incident, Goeldner continued to experience intermittent dislocations. These dislocations typically occurred years apart.

26. In or around October 2012, for example, Goeldner dislocated his left shoulder while on the job with UP. Specifically, Goeldner dislocated his left shoulder when taking off a sweater. He could not pop it back into place and, therefore, went to a local emergency room to relocate the shoulder.

27. As a result of this October 2012 incident, Goeldner filed a Personal Injury Report

with UP. That report alerted UP to the fact that Goeldner suffered a dislocated shoulder while on the job.

28. UP placed Goeldner on light duty for approximately five days and thereafter released him to full duty with no restrictions.

29. On or about August 21, 2016, Goeldner was working as the brakeman on a three man train crew in Des Moines, Iowa.

30. As Goeldner was exiting a locomotive, he leaned down to hand his lunch pail to the conductor.

31. As a result, Goeldner's backpack, which was strapped over his left shoulder, slipped and dislocated Goeldner's left shoulder.[2]

32. Goeldner was taken to a hospital in Des Moines, Iowa but was ultimately able to pop his shoulder back into place without medical intervention.

33. Goeldner was subsequently referred to orthopedic specialist Dr. Daniel Gurley by his primary care physician.

34. Following an MRI, Dr. Gurley diagnosed Goeldner with a shoulder labral tear which was repaired successfully via surgery on or about September 21, 2016.

35. In addition to repairing Goeldner's shoulder labral tear, the September 21, 2016 surgical procedure also stabilized Goeldner's shoulder, thus reducing the risk of future dislocations.

36. Dr. Gurley released Goeldner to return to work as a conductor with UP on or about December 27, 2016.

37. UP did not allow Goeldner to return to work at that time.

---

[2] Transportation department employees like Goeldner often stay overnight in other cities or towns while completing a run. Backpacks are used to store and carry overnight personal effects.

38. Rather, UP's Chief Medical Officer, Dr. John Holland, issued a February 16, 2017 Memo on Fitness for Duty Determination determining that Goeldner was unfit to continue working as a brakeman/conductor and imposed significant permanent restrictions on his ability to perform any work for UP. A true and accurate copy of UP's February 16, 2017 Memo is attached hereto as **Exhibit 2**.

39. Specifically, Dr. Holland's memo asserted that Goeldner "has a significant risk for recurrent shoulder instability and redislocation that poses an unacceptable safety risk for work if he continues to work as a Trainman/Yardman." Ex. 2 at 4.

40. Dr. Holland's memo further asserted that "[s]udden dislocation or instability of a shoulder at work represents an instance of 'sudden incapacitation' of physical function that may result in serious injury and/or contribute to a railroad accident." Ex. 2 at 5.

41. As a result, Dr. Holland imposed permanent work restrictions on Goeldner. *See id.*

42. These permanent work restrictions precluded Goeldner from returning to work as a brakeman/conductor and also greatly inhibited his ability to qualify for other positions within UP. *See id.*

43. Dr. Holland reached these conclusions and imposed these restrictions based solely upon a review of Goeldner's medical records. He did not meet with or examine Goeldner. He is not an orthopedic or shoulder specialist.

44. Goeldner's union, Brotherhood of Locomotive Engineers and Trainmen, subsequently requested that a third-party doctor review Goeldner's case to determine if he was able to perform his duties as a brakeman/conductor.

45. Dr. Holland spoke with Goeldner's orthopedic specialist, Dr. Gurley, in June 2017.

46. Via letter dated August 8, 2017, UP, through Dr. Holland, rejected Goeldner's

request for a third-party doctor review because there was no dispute that Goeldner had dislocated his left shoulder and undergone surgical repair. A true and accurate copy of Dr. Holland's August 8, 2017 letter is attached hereto as **Exhibit 3**.

47. Dr. Holland further informed Goeldner that "[t]his reconsideration of your Fitness-for-Duty determination is now complete and your current work restrictions remain in place." *Id.*

48. To the extent Goeldner needed reasonable accommodations, UP failed to accommodate him and further failed to even engage in an interactive process regarding what accommodations were possible.

49. Goeldner has never returned to work for UP in any capacity.

50. Goeldner timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") attached hereto as **Exhibit 4**.

51. On or about June 10, 2019, the EEOC issued a right to sue letter to Goeldner. A true and accurate copy of the EEOC's right to sue letter is attached hereto as **Exhibit 5**.

52. Having exhausted his administrative remedies, Goeldner timely brings this action.

### COUNT I – ADA/DISPARATE TREATMENT

53. Goeldner incorporates paragraphs 1 through 52 of his Complaint as if fully set forth herein.

54. The ADA defines a disability as (a) a physical or mental impairment that substantially limits one or more major life activities, (b) a record of such impairment, or (c) being regarded as having such an impairment. 42 U.S.C. § 12102(1).

55. At all relevant times, Goeldner was an individual with a disability under the ADA.

56. At all relevant times, Goeldner had the requisite skill, experience, education, and other job-related requirements of his position, and was therefore a qualified individual under the

7

Case 4:19-cv-00692-NKL   Document 1   Filed 08/30/19   Page 7 of 12

ADA.

57. At all relevant times, Goeldner could perform the essential functions of his brakeman/conductor position, with or without reasonable accommodations.

58. 42 U.S.C. § 12112(a) prohibits employers from discriminating against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

59. Discriminating against a qualified individual on the basis of disability includes "using qualification standards, employment tests or other selection criteria that screen out…an individual with a disability or a class of individuals with disabilities unless the standard, test, or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity." 42 U.S.C. § 12112(b)(6).

60. UP discriminated against Goeldner on the basis of disability in violation of 42 U.S.C. § 12112(b).

61. As a result of UP's violation of 42 U.S.C. § 12112, Goeldner has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Goeldner is also entitled to attorneys' fees and costs incurred in connection with these claims.

62. UP committed the above-alleged acts with reckless or deliberate disregard for the rights and safety of Goeldner. As a result, Goeldner is entitled to punitive damages.

WHEREFORE, Goeldner respectfully requests that this Court enter judgment against UP (1) in a sum which is fair and reasonable in excess of Seventh-Five Thousand Dollars ($75,000), plus the cost of instituting suit and any attorneys' fees incurred herein, (2) awarding punitive

8

Case 4:19-cv-00692-NKL   Document 1   Filed 08/30/19   Page 8 of 12

damages, (3) ordering UP to reinstate Goeldner, and (4) granting Goeldner such other and further relief as this Court deems just and proper.

## COUNT II – ADA/DISPARATE IMPACT

63. Goeldner incorporates paragraphs 1 through 52 of his Complaint as if fully set forth herein.

64. Goeldner is a qualified individual with a disability under the ADA.

65. Discriminating against a qualified individual on the basis of disability includes "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity." 42 U.S.C. § 12112(b)(6).

66. Discriminating against a qualified individual on the basis of disability also includes "utilizing standards, criteria, or methods of administration…that have the effect of discrimination on the basis of disability." 42 U.S.C. § 12112(b)(3).

67. UP discriminated against Goeldner on the basis of disability in violation of 42 U.S.C. § 12112(b).

68. UP's Fitness for Duty policies and practices disproportionately—and adversely—impact qualified individuals with disabilities, including Goeldner.

69. UP uses qualification standards that screen out and tend to screen out individuals with disabilities, including Goeldner.

70. UP cannot show that such qualification standards are job-related and consistent with business necessity.

71. As a result of UP's violation of 42 U.S.C. § 12112, Goeldner has suffered and will

9

continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Goeldner is also entitled to attorneys' fees and costs incurred in connection with these claims.

72. UP committed the above-alleged acts with reckless or deliberate disregard for the rights and safety of Goeldner. As a result, Goeldner is entitled to punitive damages.

WHEREFORE, Goeldner respectfully requests that this Court enter judgment against UP (1) in a sum which is fair and reasonable in excess of Seventh-Five Thousand Dollars ($75,000), plus the cost of instituting suit and any attorneys' fees incurred herein, (2) awarding punitive damages, (3) ordering UP to reinstate Goeldner, and (4) granting Goeldner such other and further relief as this Court deems just and proper.

## COUNT III –ADA/UNLAWFUL MEDICAL INQUIRIES

73. Goeldner incorporates paragraphs 1 through 52 of his Complaint as if fully set forth herein.

74. At all relevant times, Goeldner was an employee of UP.

75. Section 12112(d)(4)(A) of the ADA provides that "[a] covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature of severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity."

76. UP violated 42 U.S.C. § 12112(d)(4)(A) by inquiring about Goeldner's medical status and claimed alleged disability when such inquiry was not job-related or consistent with business necessity.

77. As a result of UP's violation of 42 U.S.C. § 12112(d)(4)(A), Goeldner has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in

10

Case 4:19-cv-00692-NKL   Document 1   Filed 08/30/19   Page 10 of 12

excess of $75,000. Goeldner is also entitled to attorneys' fees and costs incurred in connection with these claims.

78. UP committed the above-alleged acts with reckless or deliberate disregard for the rights and safety of Goeldner. As a result, Goeldner is entitled to punitive damages.

WHEREFORE, Goeldner respectfully requests that this Court enter judgment against UP (1) in a sum which is fair and reasonable in excess of Seventh-Five Thousand Dollars ($75,000), plus the cost of instituting suit and any attorneys' fees incurred herein, (2) awarding punitive damages, (3) ordering UP to reinstate Goeldner, and (4) granting Goeldner such other and further relief as this Court deems just and proper.

### COUNT IV – ADA/FAILURE TO ACCOMMODATE

79. Goeldner incorporates paragraphs 1 through 52 of his Complaint as if fully set forth herein.

80. Goeldner is a qualified individual with a disability under the ADA.

81. Discriminating against a qualified individual with a disability under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).

82. UP discriminated against Goeldner by failing to provide him reasonable accommodations.

83. Because UP violated the ADA, Goeldner has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Goeldner is also entitled to attorneys' fees and costs incurred in connection with these claims.

84. UP committed the above-alleged acts with reckless or deliberate disregard for the rights and safety of Goeldner. As a result, Goeldner is entitled to punitive damages.

WHEREFORE, Goeldner respectfully requests that this Court enter judgment against UP (1) in a sum which is fair and reasonable in excess of Seventh-Five Thousand Dollars ($75,000), plus the cost of instituting suit and any attorneys' fees incurred herein, (2) awarding punitive damages, (3) ordering UP to reinstate Goeldner, and (4) granting Goeldner such other and further relief as this Court deems just and proper.

Dated: August 30, 2019          SCHLICHTER, BOGARD & DENTON, LLP

Nelson G. Wolff #40796
Celia K. Douglas #57428
100 South Fourth Street, Ste. 1200
St. Louis, Missouri 63102
Tel: (314) 621-6115
Fax: (314) 621-7151
jschlichter@uselaws.com
nwolff@uselaws.com

*Attorneys for Plaintiff*